**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| KRISTIN HALE and HEATHER NOVAK, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ASURION, LLC, and THE BOARD OF TRUSTEES, ASURION, LLC 401(K) PLAN,<br><br>Defendants. | Case No.<br><br>**COMPLAINT – CLASS ACTION** |

## INTRODUCTION

1. This case arises from an employer's ongoing decision to saddle its employees' retirement savings with excessive administrative fees, including indirect fees arising from transactions with interested parties.

2. Defendant Asurion, LLC ("Asurion") created the Asurion, LLC 401(k) Plan (the "Plan"). The Plan is a defined contribution plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). Asurion serves as the plan administrator, as defined by ERISA, and is the Plan's primary fiduciary. Upon information and belief, informed by Asurion's Form 5500 filings with the Department of Labor ("DOL"), Asurion delegated its investment duties to an internal committee, the Board of Trustees, Asurion, LLC 401(k) Plan (the "Board").

3. When managing the Plan's expenses, Asurion and the Board are required to act with "care, skill, prudence, and diligence," 29 U.S.C. § 1104(a)(1)(B), "for the exclusive purpose" of "providing benefits to participants" and defraying reasonable expenses, *id.*, § 1104(a)(1)(A).

Asurion and the Board did not meet these duties, as they allowed the Plan to pay excessive fees to insiders and included imprudent investment options in the Plan.

4. The Plan is a defined contribution retirement plan sponsored by Defendant Asurion, LLC, a prominent technology solutions company headquartered in Nashville, Tennessee. As of December 31, 2024, the Plan held approximately $733 million in total assets and served 11,143 participants.

5. Each ERISA plan requires basic recordkeeping and administrative ("RKA") services. These services include maintaining sub-accounts for each participant, providing account statements, assisting in the payment of benefits, and so on. RKA has become a highly commoditized industry. Large industry names, such as Fidelity and T. Rowe Price, use digitized systems to provide RKA services at scale.

6. Large RKA providers primarily compete on price per participant, particularly when seeking business from plans with over half a billion dollars in assets. Plans of that size hold substantial bargaining power. Prudent fiduciaries take advantage of this power by seeking competing bids. The resulting price competition has resulted in the average cost for RKA services declining steadily over the past decade.

7. Among large RKA providers, price differences are not due to special services offered by one provider over another. For plans with more than half a billion dollars in assets, differences in what they pay for RKA services are mainly attributable to whether the plan's fiduciaries seek competitive bids and monitor rates. This monitoring should include a review of both direct payments and any indirect compensation (e.g., any fees the RKA provider may obtain because of the plan's investments in managed funds).

8. For the Plan here, Defendants hired Principal Life Insurance Company ("Principal Life") and Principal Trust Company ("Principal Trust") (collectively, "Principal") to provide RKA services and serve as the Plan's trustee. During the Class Period (July 2026-present), Asurion and the Board caused the Plan to directly pay more than double the market rate for Principal's RKA services. At times, the Plan paid over $100 per participant in direct RKA fees.

9. Separate from these direct payments, Asurion and the Board caused the Plan to channel approximately $444.5 million of its assets—over 61% of the Plan's total investments—into the Principal LifeTime Hybrid Collective Investment Trusts (the "Principal TDFs"), plus more than $4 million in a Small Cap Growth I separate account offered by Principal. These transactions resulted in Principal and its affiliates obtaining additional "indirect compensation."

10. ERISA prohibits fiduciaries from causing a plan to engage in a "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D). The Plan's Form 5500 filings state, "[c]ertain Plan investments are collective trust funds and a pooled separate account managed by Principal and affiliates of Principal and, therefore, these transactions qualify as party-in-interest transactions under ERISA." This lawsuit challenges the Plan's payment of excessive direct fees to Principal, as well as the indirect compensation paid by the Plan to Principal as a result of party-in-interest transactions.

11. Some of this indirect compensation occurred due to the Plan's investment in Principal's target-date funds ("TDFs"). A TDF is not a standalone asset but a "fund of funds," meaning it primarily invests in shares of underlying managed funds. These underlying funds are usually the direct owners of stocks, bonds, and other tradeable assets within the fund of funds. The TDF automatically adjusts its allocation between shares of stock-heavy funds and bond-heavy funds as it approaches a participant's expected retirement year (e.g., 2050).

12. The Principal TDFs here are collective investment trusts ("CITs"), which are not subject to the same public filing requirements as mutual funds registered with the Securities and Exchange Commission ("SEC"). Due to the non-public nature of these investments, fiduciaries must exercise caution in ensuring the accuracy of performance quotes and fees. Such fees include any hidden compensation structures in the CIT's underlying investments.

13. During the relevant period, numerous prudent TDF alternatives were available in the marketplace, including options offered by BlackRock, Vanguard, State Street, Northern Trust, and BNY Mellon. But Asurion and the Board only provided the option of Principal's TDFs, which invest exclusively in Principal's own proprietary funds.

14. Asurion and the Board selected the Principal TDFs as the Plan's Qualified Default Investment Alternative ("QDIA"). A QDIA is a fund that participants are automatically enrolled in if they do not affirmatively choose their own investments.

15. The Plan's recordkeeper, Principal, profited directly from this arrangement. By steering Plan assets into proprietary investment products that they created and managed, Principal generated substantial fees and revenue. From 2009 through the present, Asurion and the Board caused approximately 61% of the Plan's assets to be invested in the Principal TDFs. The Plan invested in each of the following target year vintages of these TDFs:

- Principal LifeTime Hybrid Income CIT X
- Principal LifeTime Hybrid 2015 CIT X
- Principal LifeTime Hybrid 2020 CIT X
- Principal LifeTime Hybrid 2025 CIT X
- Principal LifeTime Hybrid 2030 CIT X
- Principal LifeTime Hybrid 2035 CIT X
- Principal LifeTime Hybrid 2040 CIT X
- Principal LifeTime Hybrid 2045 CIT X

- Principal LifeTime Hybrid 2050 CIT X
- Principal LifeTime Hybrid 2055 CIT X
- Principal LifeTime Hybrid 2060 CIT X
- Principal LifeTime Hybrid 2065 CIT X
- Principal LifeTime Hybrid 2070 CIT X

16. Each of these TDFs largely invested in Principal's own proprietary index funds, such as its S&P 500 Fund. In almost all instances, Principal's index funds charged substantially higher fees, or "expense ratios," than alternative and better-performing index funds offered by providers such as Vanguard. These excess fees benefited Principal, the Plan's RKA provider and thus a party-in-interest.

17. As stated above, the Plan also invested more than $4 million in a separate account managed by Principal, the "Principal Small Cap Growth I – Separate Account Z." This is a separate account managed by Principal that invests in an affiliated mutual fund, the Principal Small Cap Growth I Fund.

18. These and other investments resulted in additional "indirect compensation" paid to Principal. These indirect fees were separate from Principal's direct compensation. During each Plan year, the Plan paid more than $1 million in direct fees for Principal's RKA services.

19. Plaintiffs Kristin Hale and Heather Novak were participants in the Plan. Like many other Asurion employees, Plaintiffs were harmed by Asurion's failure to prevent the Plan from overpaying for RKA services.

20. Plaintiffs and Class Members are entitled to recover losses to the Plans, including the difference between the value of their accounts as they exist today, or as of the date of distribution, and the value those accounts would hold absent Defendants' breaches of duty.

## JURISDICTION AND VENUE

21. Plaintiffs bring this action under 29 U.S.C. §§ 1132(a)(2), (3). These sections allow Plaintiffs to sue on the Plan's behalf to remedy breaches of duty and to obtain appropriate relief for the Plan under 29 U.S.C. § 1109.

22. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because this case presents a federal question arising under ERISA.

23. Under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b), venue is proper because Defendant Asurion, LLC, the Plan's sponsor, maintains its principal place of business within this district. Among other things, this district is where Defendants carried out the acts and practices that give rise to this case.

## PARTIES

### *Plaintiffs*

24. Plaintiff Kristin Hale is a citizen and resident of Lebanon, Tennessee and was a participant in the Plan during the relevant period.

25. In reliance on the investment options offered by Defendants, Ms. Hale invested her retirement savings in the Principal LifeTime Hybrid 2055 Collective Investment Trust TDF.

26. Plaintiff Heather Novak is a citizen and resident of Nokesville, Virginia and was a participant in the Plan during the relevant period.

27. In reliance on the investment options offered by Defendants, Ms. Novak invested her retirement savings in the Principal LifeTime Hybrid 2040 Collective Investment Trust TDF. Ms. Novak also invested in the Principal SmallCap Growth I account and the Great Gray MFS Large Cap Value Fund. Ms. Novak's account statements indicate that in Plan year 2023, she was charged over $120 in various administrative fees related to the Plan's investments.

28. At all relevant times, Plaintiffs held investments in the Plan that were offered and subject to the investment decisions, oversight, and processes of the Plan's fiduciaries.

29. The Class Members consist of other plan participants in the Plan who, during the Class Period, held any of the challenged target date fund assets described below.

***Defendants***

30. Asurion is a Delaware limited liability company headquartered at 1101 Church Street, Nashville, Tennessee 37203. Asurion is the sponsor and named fiduciary of the Plan within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), and, upon information and belief, appointed and was responsible for monitoring the other Defendants in their roles as trustees, investment advisers, and recordkeeper to the Plan.

31. The Board is an internal committee within Asurion, tasked with managing the Plan's investments, expenses, and administration.

32. Asurion and the Board are fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority and control over the administration of the Plan.

33. Principal Life is a "party in interest" within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14), because it provided RKA services to the Plan.

34. Principal Trust is a Delaware corporation headquartered in Des Moines, Iowa. Due to its status as the Plan's Trustee, Principal Trust is also a party in interest.

***The Plan***

35. The Plan is an "employee pension benefit plan," 29 U.S.C. § 1002(2)(A), and a "defined contribution plan," 29 U.S.C. § 1002(34).

36. As stated above, the Plan is administered and sponsored by Asurion.

37. The Plan has been in effect since January 1, 1994.

38. As of December 31, 2024, the Plan held $721,117,429 in total investments at fair value, consisting of: $689,810,749 in CITs, $25,875,604 in pooled separate accounts, and $5,431,076 in mutual funds. Total net assets available for benefits were $736,564,863.

39. Upon information and belief, Defendants maintained investment monitoring procedures, including an Investment Policy Statement ("IPS"), requiring periodic review of investment performance and expenses. Before filing this lawsuit, Plaintiffs requested that Defendants produce the Plan's IPS. To date, Defendants have not produced it.

## LEGAL BACKGROUND

40. ERISA imposes strict fiduciary duties of prudence upon Defendants as fiduciaries of the Plan. These duties are "derived from the common law of trusts." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). So, "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.*

41. The duty of prudence appears, among other places, in the following statutory text:

> A fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> a) for the exclusive purpose of:
>
>    i. providing benefits to participants and their beneficiaries; and
>
>    ii. defraying reasonable expenses of administering the plan;
>
> b) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> c) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> d) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

29 U.S.C. § 1104(a)(1).

42. ERISA similarly imports the trust law duty of loyalty by stating that fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

43. To supplement the duty of loyalty, ERISA prohibits certain transactions between the plan and any party-in-interest:

> Except as provided in section 1108 of this title:
>
> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> (B) lending of money or other extension of credit between the plan and a party in interest;
>
> (C) furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]

29 U.S.C. § 1106(a).

## FACTUAL ALLEGATIONS

### A. Defendants Charged Excessive Recordkeeping Fees

44. Principal Life received both direct and indirect compensation for its RKA services. During each year of the Class Period, the direct RKA fees paid to Principal vastly exceeded the reasonable amount paid by similar-sized plans.

45. RKA has become a highly automated, digitized, and commodified industry consisting of a few components. Those components include asset custody (holding plan assets in trust), recordkeeping (maintaining an online portal with participant sub-accounts and allocating

funds), and general administration (maintaining plan documents, making disclosures to participants, etc.).

46. Most large RKA providers, such as Principal, Fidelity, Vanguard, T. Rowe Price, ADP, Mass Mutual, Nationwide, and Paychex, use automated systems to perform RKA functions, such as maintaining account balances, processing payments, and offering participants an online portal. These providers typically offer pre-packaged form documents that plan sponsors select and modify.

47. Due to the automated computer systems used for RKA services and the resulting commodification, RKA providers primarily distinguish themselves on the basis of price. Corporate RKA providers strongly compete on price per participant and are willing to negotiate fees to acquire or retain the business of plans with more than half a billion dollars in assets.

48. In the context of RKA fees, "[s]cholars . . . have yet to consistently identify any benefit derived from higher service fees. . . . Just as increased fees do not correlate to enhanced or improved services, they also do not correspond to value creation for 401(k) plan participants or reflect more work by the recordkeeper (again, with digital recordkeeping technology, services are automated)." Lauren K. Valastro, *How Misapplying Twombly Erodes Retirement Funds*, 32 Geo. Mason L. Rev. 421, 434–36 (2025).

49. These empirical findings are supported by admissions in other litigation. The nation's largest RKA provider, Fidelity, admitted in litigation that "the value of the recordkeeping services that Fidelity has provided to [its ERISA] Plan since January 1, 2017 is $14 per participant, per year." *Moitoso v. FMR LLC, et al.*, 1:18-cv-12122, Stipulation of Facts, ECF No. 128-67, at 4-5 (D. Mass. Sep. 6, 2019). Fidelity confirmed, in other words, that $14-per-participant was the going market rate for digitized RKA services.

50. Although the Plan is worth less than $1 billion, most plans with roughly half a billion in assets and around 10,000 participants paid less than the Plan here. "One industry publication – 'The 401(k) Averages Book' – noted that the average cost of recordkeeping and administration fees combined in 2017 for much smaller retirement plans – i.e., those with 100 participants and $5 million in assets – was only $35 per participant." *In re Omnicom ERISA Litig.*, No. 20-cv-4141 (CM), 2021 WL 3292487, at *5 (S.D.N.Y. Aug. 2, 2021).

51. A 2022 survey stated that for plans with 5,000 to 15,000 participants, the average RKA fees paid amounted to roughly $50 per participant, all in.[1]

52. It should come as no surprise that fiduciary insurers disagree with some of the lower figures estimated above. One vocal insurer, Encore Fiduciary, compiled its own defense-biased survey of average RKA fees. In its 2020-2022 "Recordkeeping & Benchmarking Database" whitepaper, Encore Fiduciary looked at both direct and indirect RKA fees. Its whitepaper claimed, "[t]he following is what the average large plan pays for recordkeeping services . . . $500m-1b Plans: In 2022, 90% of plans with assets between $500m and $1b in assets paid over $35 per participant, with 80% of plans paying between $35 and $66 per participant."

53. Applying its most pro-defense methodology, Encore Fiduciary admitted that in 2022, the vast majority of plans kept RKA fees well below $66 per participant. It further admitted "[t]he vast majority of large plans over $250m in assets in America pay substantially less than plans with less than $100 in assets."

54. Encore Fiduciary's own charts show that from 2020-2022, median RKA fees for plans between $500 million to $1 billion declined from $55 to $51 per participant.

---

[1] https://www.nepc.com/wp-content/uploads/2022/02/2021-NEPC-DC-Plan-Trends-and-Fee-Survey-Full-Results.pdf.

## 2020 RK Fee By Plan Asset Size

2020 RK Fee By Plan Asset Size




Total Assets

Source: Encore Fiduciary 2020-2022 Recordkeeping & Benchmarking Database

## 2022 RK Fee By Plan Asset Size

2022 RK Fee By Plan Asset Size




Total Assets

Source: Encore Fiduciary 2020-2022 Recordkeeping & Benchmarking Database

55. Despite its defense-oriented bias, Encore Fiduciary's comparison of participant count suggests an even lower median fee is the correct benchmark. From 2020-2022, Encore Fiduciary's charts show median RKA fees of $42 per participant for plans with 10,000 – 15,000 participants, and only $32-$35 per participant for plans with over 15,000 participants.






56. Plaintiffs contend the true median RKA fee for comparable plans is nearer to $35 per participant, not Encore Fiduciary's higher estimates of $51 (by plan asset size) or $42 (by plan participant count). But no matter which survey or methodology one selects, they all yield the same conclusion: Defendants allowed the Plan to grossly overpay for RKA services.

57. During the Class Period, the Plan's total assets started at roughly $540 million. By 2024, the Plan's assets grew to over $773 million. The increased assets provided the Plan with additional bargaining power to negotiate for reduced RKA fees per participant. Despite this great leverage, Defendants allowed the Plans to pay excessive fees to Principal that were excessive from the start of the Class Period and increased over time.

58. For the 2020 plan year, the Plan paid $1,273,968 for Principal Life's RKA services. That year, the total number of active and retired participants peaked at 18,568.

59. For the 2021 plan year, the Plan paid $1,422,342 for Principal Life's RKA services. That year, the total number of active and retired participants peaked at 17,706.

60. For the 2022 plan year, the Plan paid $1,423,716 for Principal Life's RKA services. That year, the total number of active and retired participants peaked at 13,975.

61. For the 2023 plan year, the Plan paid $1,136,908 for Principal Life's RKA services. That year, the total number of active and retired participants peaked at 12,299.

62. For the 2024 plan year, the Plan paid $1,066,927 for Principal Life's RKA services. That year, the total number of active and retired participants peaked at 11,844.

63. Thus, the fees paid to Principal Life nearly approached $70 per participant in 2021, grew to over $100 per participant in 2022, and remained over $90 per participant in 2024. The chart below accurately depicts the cost per participant for RKA services each year.

| Year | Participants | Total RKA Fees | Fees Per Participant |
|---|---|---|---|
| 2020 | 18,568 | $1,273,968 | $68.61 |
| 2021 | 17,706 | $1,422,342 | $80.33 |
| 2022 | 13,975 | $1,423,716 | $101.88 |
| 2023 | 12,299 | $1,136,908 | $92.44 |
| 2024 | 11,844 | $1,066,927 | $90.08 |

64. These amounts are excessive for a plan of the Plan's size. The Plan's per participant fee also increased over time when it should have decreased, owing to the Plan's growing size and bargaining power.

65. From Plan years 2020 to 2022, the Plan increased not only the effective per participant fee but the total aggregate fees paid to Principal. Worse still, the increase in total fees coincided with a decrease in Plan participants during these years.

66. From 2020 to 2021, Principal's direct RKA fees charged to the Plan increased from $1,273,968 to $1,422,342, despite a decrease in participant count from 18,568 to 17,706. The following year, its fees increased further to $1,423,716, despite the participant pool decreasing to 13,975 individuals. The Plan's 5500 filings provide no rationale for these fee increases.

67. Even these direct fees, however, understate Principal's total compensation from the Plan. The Plan's 5500s confirm that Principal received additional "indirect compensation" from the Plan's invested assets. Most commonly, "indirect compensation" refers to revenue-sharing, in which a managed fund kicks back a portion of its fees to the entity that caused the Plan to invest in the fund.

68. Participant account statements corroborate Principal's indirect compensation from the Plan's invested assets. For Plan year 2023, participant account statements admit, "[t]he underlying investment options also have fees. Some of the plan's administrative expenses were paid from the total investment expense of one or more of the plan's investment options."

69. Ms. Novak's statements depict examples of investment-related fees that may have been used to compensate Principal. For instance, her statements indicate that she paid over $120 per year in administrative fees. These fee deductions are attributed to various assets, including the Principal LifeTime Hybrid 2040 CIT, the SmallCap Growth I Separate Account, and the MFS Large Cap Value CIT.

70. Other plans with over $500 million in assets tend to pay much lower fees per participant for RKA services. Examples of comparable plans are provided below. This chart adds up direct fees and any indirect fees clearly disclosed on the plans' form 5500 filings.

| Plan | Year | Participants | Plan Assets | RKA Fees Per Participant |
|---|---|---|---|---|
| Jeld-Wen 401(k) Retirement Savings Plan | 2024 | 14,284 | $517,563,088 | $36.81 |
| Genpact U.S. 401(k) Savings Plan | 2023 | 10,914 | $529,736,317 | $23.86 |
| Staples US Retail 401(k) Retirement Plan | 2024 | 13,182 | $398,499,919 | $38.75 |
| Ace Hardware Corporation 401(k) Savings and Retirement Plan | 2024 | 10,783 | $1,152,405,235 | $32.20 |
| Ralph Lauren Corporation 401(k) Plan | 2022 | 17,270 | $550,568,023 | $29.44 |
| Change Healthcare 401(k) Savings Plan | 2020 | 15,495 | $610,716,806 | $44.38 |
| Serco, Inc. 401(k) Retirement Plan | 2023 | 12,063 | $577,351 | $47.86 |
| Northeast George Health System Inc. 401(k) Savings Retirement Plan | 2024 | 14,317 | $843,864,287 | $55.64 |
| Perrigo Company Profit Sharing and Investment Plan | 2024 | 7,048 | $1,018,298,119 | $56.78 |
| Valvoline 401(k) Plan | 2021 | 12,334 | $540,631,395 | $47.47[2] |
| Consolidated 401(a) and 401(k) Program of Mass General Brigham and Member Organizations | 2022 | 10,817 | $543,985,000 | $9.14 |

71. The RKA services provided by these plans are similar to those provided by Principal here. There is no indication on the Plan's 5500 filings that Principal's work included any

[2] This amount includes an estimate of the sub-advisory fees paid to Fidelity, the recordkeeper of the Valvoline 401(k) Plan. These fees are revenue-sharing fees paid by mutual funds held within a Fidelity BrokerageLink Account, which allows participants to self-select investments. These fees ranged from 10 basis points (0.10%) to 40 basis points (0.40%), charged only against certain assets. Applying the highest fee of 40 basis points to the entire brokerage account value ($43 million) yields $172,000. Adding this amount to the direct fees paid to Fidelity ($412,987), the total RKA fees paid by the Valvoline 401(k) Plan were, at most, $584,987.

unique services necessary to the Plan's operation, above and beyond the bundled RKA package in the examples above.

72. The true reason for the artificially high fees lies, at least in part, with Defendants' decision to choose a life insurance company, Principal, for the Plan's RKA needs. In 2018, a company surveying RKA fees for small plans concluded, "high 401(k) fees are par for the course with insurance company 401(k) providers . . . [T]hese [insurance company] 401(k) providers also tend to charge the most hidden fees. The combination of high 401(k) fees that are hard to find make insurance company 401(k) providers a risky bet for employers with a fiduciary responsibility to pay only reasonable 401(k) fees from plan assets."[3]

73. The same company lists examples in which it reduced small plans' RKA fees to Principal, often by 79.62%,[4] or over 81%.[5] These reductions came from negotiating with Principal and switching from Principal's proprietary funds to assets with more transparent fees. These examples reveal how Principal used opaque investment vehicles—such as the separate accounts and CITs here—to charge fees that are not listed on public prospectuses. These small plans achieved enormous savings by replacing Principal's proprietary funds with cheaper alternatives from Vanguard. By contrast, Defendants allowed Principal to engage in interested-party transactions that channeled Plan assets into Principal's proprietary funds.

74. Given the Plan's large size, Defendants had substantial bargaining power to reduce the per-participant fees paid to Principal. By comparison, a plan sponsored by Provident Bank

---

[3] https://www.employeefiduciary.com/blog/insurance-company-401k-fees.

[4] https://www.employeefiduciary.com/hubfs/fee_comparisons/Principal-$2%2c416%2c843.23-46emp-79.62.pdf.

[5] https://www.employeefiduciary.com/hubfs/2024%20Fee%20Comparisons/Fee_Comparison_2024_Principal_$4%2c544%2c846.00_43_81.59%25.pdf.

capped RKA fees paid to Principal to $138,579 for Plan year 2024, against a participant population of 2,200 individual and total plan assets below $200 million.

| Plan | Year | Participants | Plan Assets | RKA Fees Per Participant |
|---|---|---|---|---|
| Provident Bank 401(k) Plan | 2024 | 2,200 | $184,116,736 | $61.90 |
| Asurion LLC 401(k) Plan | 2024 | 11,844 | $733,332,405 | $90.08 |

75. For the Provident Bank 401(k) Plan, Principal supplied the following DOL service codes to describe its RKA services: 13 (contract administrator), 37 (participant loan processing), 50 (direct payment from plan), and 64 (recordkeeping fees). These are the same service codes reported by Asurion for Principal's RKA services to the Plan here.

76. Defendants allowed Principal to charge much higher fees per participant than it charged to the Provident Bank 401(4) Plan for the same services. They did so despite having far greater bargaining power on account of the Plan's vastly larger asset size. As compared to plans with less than $200 million in assets, plans with more than $500 million usually pay much lower fees per participant. Likewise, plans with more than 10,000 participants typically pay lower per-participant fees than plans with less than 5,000 participants.

77. A reasonable fiduciary would have compared RKA fees among a range of providers before deciding to retain Principal. A prudent fiduciary in Defendants' position would have conducted regular, competitive bidding for RKA services, benchmarked RKA fees against comparable plans, and ensured that the Plan paid no more than a reasonable market rate. Defendants failed to take these steps.

78. By failing to control costs, Defendants imposed two distinct types of harm on Class Members. "Beneficiaries subject to higher fees . . . lose not only the money spent on higher fees,

but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016).

79. Defendants should be required to restore the Plan for both types of harm.

**B. <u>Defendants' Transactions Involved Prohibited Dealings with Parties in Interest</u>**

80. The Plan's audited financial statements for the year ended December 31, 2024, acknowledge that "[c]ertain Plan investments are collective trust funds and a pooled separate account managed by Principal and affiliates of Principal and, therefore, these transactions qualify as party-in-interest transactions under ERISA."

81. The following Plan investments are transactions with parties in interest: (a) all 13 Principal LifeTime Hybrid CITs (totaling approximately $444.5 million), managed by Principal's affiliates in the same group of companies, (b) the Principal SmallCap Growth I Separate Account-Z ($4,025,823), a pooled separate account managed by Principal Life.

82. In each of these transactions, Asurion used Plan assets to benefit a party in interest (the Principal-affiliated Defendants). These transactions are not exempted from the prohibited transaction rules of ERISA § 406(a).

83. Defendant Principal Life Insurance Company served as the Plan's contract administrator and recordkeeper during the relevant period.

84. As explained above, Principal's direct compensation often exceeded $90 or even $100 per participant, far above the typical amount for bundled RKA services. Yet the Plan's 5500s state that Principal received additional "indirect compensation."

85. The Plan's 5500 filings do not disclose the total amount of indirect fees received by Principal. Nor do they disclose the specific investments from which Principal receives these fees.

These filings state only that Principal receives fees equal to 10 basis points (0.10%) of assets managed by Capfinancial Partners, LLC, plus 15 basis points (0.15%) of assets managed by Morningstar Investment Management, LLC.

86. Based on information and belief, Plaintiffs allege that Principal received indirect compensation from the Plan's investments in its proprietary assets, the Principal LifeTime Hybrid CITs and Principal SmallCap Growth I Separate Account.

87. Each of the Principal TDFs, in turn, invested in Principal's underlying mutual funds. Approximately 60% to 70% of the assets in each Principal TDF are invested in four core index funds tracking widely followed market benchmarks: (1) an S&P 500 index fund, (2) a Bloomberg U.S. Aggregate Bond Index fund, (3) an S&P MidCap 400 index fund, and (4) an S&P SmallCap 600 index fund. These core index allocations represent the bulk of each TDF's portfolio.

88. An index fund is a passively-managed investment that seeks to track, not beat, a market index. Therefore, the primary difference between index funds is price. Rather than selecting the lowest-cost and best-performing index funds available in the institutional marketplace, Defendants filled these core allocations with proprietary Principal-affiliated index funds. This decision was driven not by the interests of Plan participants but by Defendants' desire to generate management fees for Principal-affiliated investment managers.

89. Principal's proprietary index funds have consistently underperformed their marketplace peers while charging higher fees. For example, depending on share class, the Principal Large Cap S&P 500 Index Fund charges an expense ratio of between 0.10% to 0.30%. More popular S&P 500 index funds with lower fees include the Vanguard Institutional Index (expense ratio: 0.03%) and the Schwab S&P 500 Index Fund (expense ratio:0.02%). The Principal Large

Cap S&P 500's higher price was not justified by a superior performance; on the contrary, it consistently performed worse than peers.

90. The same pattern holds for Principal's other proprietary index funds, comprising most of the Principal TDFs' portfolio. These funds charge above average fees for average or below average performance compared to available index fund alternatives. As a result, Principal receives additional indirect compensation above and beyond its already-excessive direct fees.

91. Because these are party-in-interest transactions, they are "presumptively unlawful." *Cunningham v. Cornell Univ.*, 604 U.S. 693, 700 (2025). It is Asurion's burden to prove, as an affirmative defense, that these transactions were (1) for "services necessary for the . . . operation of the plan" and (2) "no more than reasonable compensation was paid." *Id.* at 702.

92. Asurion cannot meet this burden. The direct RKA fees paid to Principal far exceeded the typical rate paid to competitors. Any additional indirect compensation is neither reasonable nor necessary for the Plan's operation.

### C. **Defendants Breach Their Duty of Prudence**

93. Asurion and the Board also included imprudent investment options in the Plan. One such option was the MFS Large Cap Value CIT, which Plaintiff Novak invested in. As of Plan Year 2024, Asurion and the Board caused over $13 million in Plan assets to be channeled into this fund.

94. According to available public documents, the MFS Large Cap Value CIT has, since inception, fallen behind its index benchmark, the Russell 1000 Value TR USD.

95. Due to this persistent underperformance since inception, the MFS Large Cap Value CIT has maintained a negative information ratio ("IR") of -0.72 and a Sharpe Ratio of 0.64.[6]

[6] https://my.voya.com/static/epweb/pdf/ffs/F501.PDF.

96. The Sharpe Ratio and IR are measures of risk relative to return, but they use different metrics. The Sharpe Ratio measures "risk-adjusted return," measuring return against an investment considered risk-free, such as U.S. Treasuries, and measuring risk by volatility, or "standard deviation" (how much the asset's price swings up and down). Generally, a Sharpe Ratio below 1.0 is considered poor.

97. On the other hand, IR measures how much extra return a fund consistently generates when compared with a benchmark such as the S&P 500 index. IR is the accepted measure of risk-adjusted return for actively-managed funds, such as the MFS Large Cap Value CIT. IR measures how much extra return the fund provides compared with a benchmark, then measures the volatility of those returns. It is a means of assessing a manager's skill and whether investors are receiving value.

98. For a standard retail investor, "an IR between 0.4 and 0.6 is considered good, above 0.6 is very good, and above 1.0 is exceptional, indicating consistent outperformance."[7] The following "guideline IR ranges" apply to retail investors:

> "≤ 0.0: Poor
> 0.0 – 0.4: Low to average
> 0.4 – 0.6: Good
> 0.6– 1.0: Very good
> > 1.0: Exceptional."[8]

99. For an investment fiduciary, an IR below 0.5 is generally unacceptable. The duty of prudence requires limiting actively-managed funds to those with at least a "good" chance of beating the market index.

---

[7] https://www.schwab.com/learn/story/hows-that-fund-doing-check-information-ratio.
[8] *Id.*

100. The MFS Large Cap Value CIT is not a publicly-registered fund, so it is not required to report marked-to-market valuations to the public. However, some fact sheets are publicly available. These fact sheets reveal that since inception, the MFS Large Cap Value CIT consistently underperformed its benchmark, the Russell 1000 Value TR USD, yielding a negative information ratio and a Sharpe Ratio well below 1.0.

101. According to documents that can be found publicly, the MFS Large Cap Value CIT is rated a mere two out of five stars under the criteria used by Morningstar.

102. Morningstar provides insight into industry sentiment. It rates assets within various categories on a scale of one to five stars. Each Morningstar Category groups investments into peer categories based on similar risk, return, and behavior profiles. All Morningstar star ratings are backward-looking, risk-adjusted rankings of a fund relative to other funds in the same category. Funds are then ranked in their category on this risk-adjusted return; the top 10% get five stars, the next 22.5% get four stars, and the middle 35% get three stars, the next 22.5% receive two stars, and the bottom 10% receive one star. While Morningstar ratings have limitations, a sub-par Morningstar rating would cause a reasonable fiduciary to question a fund's inclusion.

103. Here, the MFS Large Cap Value CIT's two-star rating would serve as a red flag for a prudent investment fiduciary.

104. Here, Plaintiffs requested the IPS and other Plan documents before suit, but Asurion failed to provide them on a timely basis.

## CLASS ACTION ALLEGATIONS

105. Plaintiffs bring this action pursuant to Rule 23 on behalf of the class of persons described herein and on behalf of the Plans. Plaintiffs reserve the right to revise their class

definitions and to propose other or additional classes in subsequent pleadings or in their motion for class certification, after discovery in this action.

106. Plaintiffs bring this action on behalf of themselves and the Class, which is defined as participants in and beneficiaries of the Plan, with the exception of Defendants; members of the Board and any other fiduciaries responsible for selecting or monitoring the challenged investments; officers and directors of Asurion; members of their immediate families; Plaintiffs' counsel; the judges assigned to this action and their immediate family members; and the legal representatives, successors, or assigns of any excluded person.

107. The Class Period is from the beginning of the applicable statute of limitations period to Plaintiffs' claims through the date of judgment.

108. Plaintiffs assert these Counts against Defendants on behalf of the Plan and, in acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan.

109. **Numerosity:** The Classes are so numerous that joinder of all Class members is impracticable. At all relevant times the Plan had over 11,000 participants.

110. **Typicality:** Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are current or former participants in the Plan who have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants managed the Plan as a single entity, in an omnibus account, and therefore Defendants' imprudent decisions affected all Plan

participants similarly. All Class members are trust beneficiaries of the same trust and use the same custodian and recordkeeping system.

111. These mutual fund securities are not registered to or owned directly by Plan participants—unlike individual retirement accounts (IRAs). The Plans' trusts own the SEC-registered securities and buy and sell them at an omnibus or net aggregate trust level, settling shares daily with the recordkeeper, which updates individual participant account balances through daily valuation.

112. Therefore, each Plan participant or Class Member is a beneficiary of the same trust and participates through a common trust company and a common recordkeeping firm.

113. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs have no interests antagonistic to the Class, and questions of law and fact are common to Class members and predominate over any individualized questions. Plaintiffs understand that this matter cannot be settled without Court approval.

114. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are aligned with those of the Class. Plaintiffs have no conflicts of interest that would impair their ability to represent the Class.

115. Plaintiffs have retained counsel with experience in common law trust investment management, ERISA litigation, and class actions.

116. **Commonality**: Common questions of law and fact predominate, including but not limited to:

a. Whether Defendants breached their duty of prudence by failing to adequately monitor and evaluate the Plans' investment options;

b. Whether Defendants breached their duty of loyalty by favoring proprietary Principal investment products over superior and less expensive alternatives;

c. Whether Defendants caused the Plan to engage in prohibited transactions with parties in interest in violation of ERISA § 406;

d. Whether Defendants failed to investigate and utilize lower-cost investment vehicles and share classes;

e. Whether Defendants failed to prudently monitor the performance and expenses of the Principal TDFs;

f. Whether Defendants caused the Plan to pay unreasonable recordkeeping and administrative fees to Principal-affiliated entities;

g. Whether Asurion breached its duty to monitor the fiduciaries responsible for selecting and monitoring Plan investments;

h. The amount of losses suffered by the Plan as a result of Defendants' fiduciary breaches; and

i. The nature and extent of appropriate equitable, declaratory, and monetary relief.

117. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a substantial risk of inconsistent or varying adjudications, resulting in incompatible standards of conduct governing Defendants' fiduciary obligations. Absent class treatment, different courts could impose conflicting requirements on Defendants' management and administration of the Plans. Certification is appropriate under Rule 23(b)(1)(A) because separate actions would create a risk of inconsistent adjudications establishing incompatible standards governing Defendants' fiduciary obligations under ERISA.

118. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications as to individual Class members would, as a practical matter, be dispositive of the interests of other Plan participants or would substantially impair or impede their ability to protect those interests. Any equitable relief ordered by the Court—such as the removal of imprudent Plan investments or fiduciaries—would necessarily affect the Plans as a whole. Likewise, the accounting for losses and restoration of Plan assets required under 29 U.S.C. §§ 1109 and 1132 would inure to the benefit of all participants, rendering individual actions impracticable.

119. Class certification is further appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this action. Defendants' conduct, as alleged, was uniform and affected all Class members in the same manner.

120. Class members have little interest in pursuing separate actions against Defendant because the amount of each individual claim is relatively small compared to the expense and burden of individual litigation. Plaintiffs are unaware of any similar individual actions brought by Class members asserting these claims.

121. Class certification will also avoid duplicative litigation and reduce the risk of inconsistent or conflicting judgments concerning Defendant's fiduciary practices.

122. Managing this action as a class action will not present any unusual or insurmountable difficulties, as the claims arise from common policies, practices, and fiduciary decisions applicable to the Plans as a whole.

123. In the interests of justice and judicial efficiency, concentrating the litigation of all Class members' claims in a single forum is both desirable and appropriate.

**COUNT I**
**BREACH OF DUTY OF PRUDENCE**
**29 U.S.C. § 1104(A)(1)(A)**

124. Plaintiffs incorporate by reference the allegations in all preceding paragraphs in the "Facts" section above.

125. During the Class Period, all Defendants were fiduciaries of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Each Defendant exercised discretionary authority or control over Plan administration and assets.

126. Defendant breached its duty of prudence by failing to control RKA costs through regular monitoring, competitive bids, and use of the Plan's bargaining power based on its size.

127. Defendants also caused the Plan to include the imprudent MFS Large Cap Value CIT in its investment menu, causing losses to Plaintiff Novak and Class Members.

128. Under ERISA §§ 409(a), 502(a)(2), and (a)(3) (29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3)), Defendants are liable to restore to the Plan all losses caused by its breaches, disgorge any profits derived from Plan assets, and provide other appropriate relief.

129. On behalf of the Plan, Plaintiffs also seek appropriate equitable relief under ERISA § 502(a)(3), recovery of prejudgment interest, and an award of attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

**COUNT II**
**PROHIBITED TRANSACTIONS WITH A PARTY-IN-INTEREST**
**29 U.S.C. § 1106(a)(1)(A), (C)–(D)**

130. Plaintiffs incorporate by reference the allegations in all preceding paragraphs in the "Facts" section above.

131. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), prohibits a fiduciary with respect to a plan from causing the plan to engage in a transaction if the fiduciary knows or should know that such transaction constitutes: (A) a sale, exchange, or lease of any property between the plan and a

party in interest; (C) the furnishing of goods, services, or facilities between the plan and a party in interest; or (D) a transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.

132. Principal Life, Principal Trust, and their affiliates are parties in interest to the Plan under 29 U.S.C. § 1002(14). Each provides services to the Plan as trustee or RKA provider.

133. Asurion caused the Plan to engage in transactions with these parties in interest, including by: (a) investing approximately $444.5 million of Plan assets in the Principal LifeTime Hybrid CITs, which are managed and administered by Principal's affiliates, in exchange for trustee and investment advisory fees; and (b) investing Plan assets in the Principal SmallCap Growth I Separate Account-Z, a pooled separate account managed by Principal Life in exchange for management fees. Each of these transactions involved the furnishing of trustee, investment advisory, or management services between the Plan and a party in interest, and the use of Plan assets for the benefit of a party in interest.

134. Asurion also caused a party-in-interest transaction each time it channeled Plan assets into investments managed by Capfinancial Partners, LLC or Morningstar Investment Management, LLC. In each instance, these entities paid revenue-sharing fees to Principal Life as a result of the Plan entering these transactions.

135. Each such transaction constituted a prohibited transaction under ERISA § 406(a)(1)(A), (C), and (D) because Defendants knew or should have known that the transaction involved the furnishing of services between the Plan and parties in interest and the transfer or use of Plan assets for the benefit of parties in interest, and because Defendants have not established, and cannot establish, that all compensation received by Principal from the Plan was for services

necessary for the operation of the Plan and no more than reasonable compensation was paid for those services within the meaning of ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

136. As a direct and proximate result of these prohibited transactions, the Plans paid excessive administrative and investment-related fees and suffered millions of dollars in lost earnings.

137. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Asurion is liable to restore all losses suffered by the Plans and to disgorge all revenues received as a result of the prohibited transactions. Plaintiff also seeks appropriate equitable relief under 29 U.S.C. § 1132(a)(3).

138. Plaintiff therefore seeks all remedies available to them and to the Plans to redress these prohibited transactions.

**COUNT III**
**FAILURE TO PROVIDE REQUESTED PLAN DOCUMENTS**
**IN VIOLATION OF ERISA §104(b)(4)**

139. Plaintiffs incorporate by reference the allegations in the "Facts" section above.

140. On July 7, 2026, Plaintiffs made written requests to Asurion, the Plan administrator, for relevant Plan documents. These documents included the Plan's IPS and "other instruments under which the plan is established or operated." 29 U.S.C. §1024(b)(4).

141. More than 30 days have passed since that request. Asurion has not responded or produced any requested documents.

142. Plaintiffs therefore seek statutory penalties of up to $110 per day for each day of the Plan Administrator's noncompliance. *See* ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1), and 29 C.F.R. § 2575.502c-1. Plaintiffs also seek reasonable attorneys' fees and costs under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that this Court enter judgment against Defendants and grant the following relief:

a. Certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1), or alternatively 23(b)(3), and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

b. Declaring that Defendants have breached their fiduciary duties under ERISA and have engaged in prohibited transactions under ERISA § 406(a), 29 U.S.C. § 1106(a);

c. Ordering Defendants, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), to restore to the Plan all losses resulting from Defendants' breaches of fiduciary duty and prohibited transactions;

d. Ordering Defendants to disgorge all profits earned by Defendants and their affiliates as a result of their breaches of fiduciary duty and prohibited transactions;

e. Ordering equitable restitution, including the imposition of a constructive trust and/or equitable surcharge, on all amounts by which Defendants and their affiliates were unjustly enriched at the expense of the Plan and its participants;

f. Ordering an accounting of all fees, compensation, and profits received by Defendants and their affiliates in connection with the Plan's investments in the Principal TDFs and the Plan's recordkeeping arrangement with Principal Life;

g. Ordering such other equitable and remedial relief as the Court may deem appropriate, including removal of Defendants as fiduciaries and appointment of

independent fiduciaries, reformation of the Plan's investment lineup, and prospective injunctive relief;

h. Awarding Plaintiffs pre-judgment interest on all amounts recovered;

i. Awarding Plaintiffs their reasonable attorneys' fees and costs of suit pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g); and

i. Granting such other and further relief as this Court deems just and proper.

Respectfully submitted: August 25, 2026

/s/ Mark Silvey
Mark E. Silvey, BPR# 013415
Bryson Harris Suciu DeMay, PLLC
201 Sevilla Avenue, Suite 200
Coral Gables, FL 33134
C: (865) 919-8839
msilvey@brysonpllc.com

Jimmy W. Mintz*
Bryson Harris Suciu DeMay, PLLC
201 Sevilla Avenue, 2nd Floor
Coral Gables, FL 33134
Tel.: (786) 879-8200
jmintz@brysonpllc.com

James R. DeMay*
Bryson Harris Suciu DeMay, PLLC
900 West Morgan Street
Raleigh, NC 27603
Phone: (704) 941-4648
jdemay@brysonpllc.com

`

**Pro Hac Vice Applications Forthcoming*